JEFFREY M. MOVIT (SBN 349686)
Email: jeff@chaudhrylaw.com
CHAUDHRYLAW PLLC
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
Tel.: 212-785-5550
Fax: 212-898-9040

Attorney for Plaintiff Artist Partner Group, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ARTIST PARTNER GROUP, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXIS JAYDE BURNETT, professionally known as LEXI JAYDE, an Individual, and DOES 1-20, inclusive,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. 24-cv-10881

**COMPLAINT FOR:**

  1. **COPYRIGHT INFRINGEMENT**

  2. **BREACH OF CONTRACT**

Plaintiff Artist Partner Group, Inc. ("APG," "Plaintiff," or "Company"), by and through its undersigned attorneys, for its Complaint against Defendant Alexis Jayde Burnett, professionally known as Lexi Jayde ("Jayde," "Defendant," or "Artist") and Does 1–20 (collectively, "Defendants"), alleges on personal knowledge as to its own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.    APG is a record label.  Jayde is a musical recording artist.

- 1 -

COMPLAINT

2.      APG and Jayde are parties to a December 16, 2020, Recording Agreement.  Pursuant to the Recording Agreement, APG has dedicated substantial time, effort, staff resources, and hundreds of thousands of dollars in developing Jayde's career.  Indeed, APG recently paid Jayde the significant sum of $175,000.  In total, APG has paid approximately $200,000 in advances to Jayde, approximately $170,000 in recording costs, and approximately $300,000 in marketing costs.

3.      In complete disregard for APG's substantial investment in her recording career, Jayde is committing willful actions which flagrantly violate the express provisions of the Recording Agreement and APG's intellectual property rights.  Bluntly stated, Jayde wrongfully seeks to walk away from her obligations to APG, while retaining all the money and other benefits she has received from APG.

4.      *First*, pursuant to the Recording Agreement, Jayde was required to "Deliver" her "First Album [of recorded music to APG] within fifteen (15) months following commencement of the Initial Period"—*i.e.*, by March 2022, nearly three years ago.  However, Jayde never Delivered the First Album to APG.  As explained in more detail below, Jayde did not Deliver the First Album because, as a condition for Delivery, she insisted that APG make substantial financial concessions in connection with that Album, which concessions contravene the express terms of the Recording Agreement.

5.      *Second*, Jayde is now baselessly contending that she terminated the Recording Agreement in October 2024, and that she purportedly has no further obligations thereunder.  Quite the contrary; the Recording Agreement remains in full force and effect.  Jayde wrongly asserts that she effected the Recording Agreement's termination in October 2024 pursuant to the procedures set forth in Section A.11.b of that agreement.  However, Section A.11.b sets forth express conditions that must be fulfilled before Jayde may effect a termination.  The requisite conditions for termination in Section A.11.b have **not** been fulfilled.

- 2 -
COMPLAINT

6.      Through her meritless contention that the Recording Agreement has purportedly terminated, Defendant seeks to walk away from her contractual obligations—with no legal basis for doing so—while retaining the hundreds of thousands of dollars and other valuable consideration that APG has given her under the contract.  Tellingly, Jayde has not paid back any of the monies she received from APG, and she clearly has no intention to do so.

7.      *Third*, pursuant to the terms of the Recording Agreement, APG is the exclusive copyright owner of all musical recordings created by Jayde during its term. In the Recording Agreement, "Recording" is defined as:

> [A]ny recording of sound or data used in the production of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Records or for any other use of sound, including temporary copies for so-called "caching" or "buffering."

Agreement at p. B-10.  Nonetheless, Jayde is posting musical recordings she created during the term to social media without APG's consent. Through these actions, Jayde is committing willful copyright infringement.

8.      To remedy Jayde's wrongful conduct, APG seeks, among other relief: (1) damages and injunctive relief arising from Jayde's breaches of the Recording Agreement; and (2) monetary damages and injunctive relief arising from Jayde's willful copyright infringement.

## JURISDICTION AND VENUE

9.      This is a civil action in which Plaintiff seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq*.

10.     This Court has original subject matter jurisdiction over Plaintiff's copyright infringement claims pursuant to 28 U.S.C. § 1331 and 1338(a).

11.     This Court has supplemental jurisdiction over Plaintiff's breach of

- 3 -

COMPLAINT

contract claim pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Jayde because she is a citizen of the State of California.  This Court further has personal jurisdiction over Jayde because Jayde committed a substantial part of the wrongful acts alleged in the Complaint within this district.  This Court additionally has personal jurisdiction over Jayde because Section F.10.f of the Recording Agreement provides in relevant part: "You agree to submit yourself to the sole and exclusive jurisdiction of the federal or state courts located in Los Angeles County in any action related to this agreement."

13.     Venue is proper in this district under 28 U.S.C. § 1391 (b) and (c) and § 1400(a) because a substantial part of the acts of infringement, and other events and omissions complained of herein occur, or have occurred, in this district, and this is a district in which Defendant resides or may be found.  In addition, venue is proper in this district because of the provisions of Section F.10.f of the Recording Agreement that are quoted in the preceding paragraph of this Complaint.

## THE PARTIES

14.     Plaintiff is a Delaware corporation with its principal place of business in Los Angeles, California.

15.     Jayde is a citizen of the State of California and a resident of Los Angeles, California.

16.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sue said defendants by such fictitious names (the "Doe Defendants").  Plaintiff will seek leave of Court to amend this complaint to state their true names and capacities when they have been ascertained.  The Doe Defendants are liable to Plaintiff as a result of their participation in all or some of the acts hereinafter set forth.  Jayde and the Doe Defendants are referred to collectively herein as "Defendants."

COMPLAINT

17.    At all times mentioned in this Complaint, each of the Defendants was the agent and/or alter ego of each of the other Defendants and, in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

## STATEMENT OF FACTS

**A.    Plaintiff's Business and Its Copyrights**

18.    APG is a highly respected, established record label.  It invests substantial money, time, effort, and talent to develop, produce, publish, acquire, license, and otherwise exploit the copyrights in sound recordings, including some of the most popular sound recordings in the world.

19.    APG owns the copyrights in musical recordings, including the musical recordings listed in **Exhibit A** (the "Copyrighted Recordings").  As the owner of copyrights in these recordings, APG possesses the exclusive rights, among other things, to reproduce the Copyrighted Recordings in copies, to adapt them, to distribute copies to the public, to perform the Copyrighted Recordings publicly by means of a digital audio transmission, and to license these exclusive rights including on television and over the Internet.

**B.    The Provisions of the Recording Agreement**

**1.    The Term of the Recording Agreement**

20.    Sections A.2 and A.3 of the Recording Agreement provide that the term (*i.e.*, the duration) of the Recording Agreement (the "Recording Term") may last for up to five separate contract periods, if Defendant so elects.  Specifically, the Recording Agreement provides for a mandatory "Initial Period," which is thereafter followed by four separate, additional contractual extension periods which Defendant has the option to invoke.  These four extension periods are respectively called the "First Option Period," the "Second Option Period," the "Third Option Period," and the "Fourth Option Period."

21.    Section A.3 of the Recording Agreement sets forth a "Recording

- 5 -
COMPLAINT

Commitment" for each contract period; until the specified Recording Commitment for a particular contract period is completed, that contract period cannot conclude. During the Initial Period of the Recording Term, the Recording Commitment requires Jayde to Deliver to Defendant one "Album"[1] and one "Committed Project."[2] (The requirements for "Deliver[y]" of a recording by Jayde to APG are set forth in detail on page B-5 of the Recording Agreement.)

22. Pursuant to Section A.3.b of the Recording Agreement, Jayde was required to Deliver her "First Album [to APG] within fifteen (15) months following commencement of the Initial Period"—i.e., by March 2022, nearly three years ago.

## 2. The "Recording Procedure" and "Delivery" Provisions

23. Pursuant to the "Recording Procedure" set forth in Section A.4.a of the Recording Agreement, the recordings that are "Delivered" by Jayde to APG must be "commercially satisfactory" to Company. Section A.4.a provides in part:

> Prior to the commencement of each recording session, (i) you and Company will mutually agree on each of the following before you proceed further: (A) selection of each producer and the financial terms of your agreement with such producer (and mixer and/or remixer, if known at the time and if applicable); (B) selection of material, including the number of Compositions to be recorded; and (C) the dates and locations (including studios) of recording (and mixing and/or remixing, if applicable), and (ii) you will obtain and deliver to Company executed certificates of employment for all producers (and, if known at the time, mixers and/or remixers, if applicable) in Company's then-standard form. In addition, at least fourteen (14) days before the proposed date of the first recording session for the applicable

[1] An "Album" is defined on page B-1 of the Recording Agreement as "a Record having no less than forty (40) minutes of playing time and which embodies at least eleven (11) Masters each containing a different Composition commercially used in a single package."

[2] The "Committed Project" is defined in Section A.3.a of the Recording Agreement as "either (i) two (2) EPs comprised of no fewer than five (5) Masters each; or (ii) one 'mixtape' of no fewer than nine (9) Masters."

- 6 -
COMPLAINT

Recordings, you will submit to Company in writing a proposed recording budget setting forth, in itemized detail, all anticipated Recording Costs. Upon receipt of Company's written approval of such recording budget (the "Authorized Budget"), you shall commence such sessions . . . . Nothing in this agreement obligates Company to continue or permit the continuation of any recording sessions, even if previously approved hereunder, if Company reasonably anticipates that the Recording Costs for the applicable Masters will exceed the Authorized Budget or that Masters constituting the applicable Committed Record will not be technically and commercially satisfactory.

Thus, the "Recording Procedure" and "Delivery" provisions, in tandem, provide APG with the right to reject recordings that it deems commercially unsuitable and fail to meet the company's reasonable standards for profitability.

24. The "Recording Procedure" and "Delivery" provisions in the Recording Agreement are standard in the music industry. They are designed to protect the interests of both the artist and the record label: the artist benefits from the record label's resources in recording her music, and the label is afforded the ability to invest prudently in the artist's career by rejecting music that is commercially unsuitable.

### 3. The "Events of Default" Procedure

25. Section A.11.b of the Recording Agreement, which is entitled "Events of Default," contains the following language:

If Company refuses without cause to allow you to fulfill the Recording Commitment for any Contract Period and if, not later than ninety (90) days following that refusal, you send Company a notice referencing this paragraph and advising Company that you are ready, willing and able to fulfill such Recording Commitment, then Company shall permit you to fulfill such Recording Commitment by notice to you to such effect within thirty (30) days following Company's receipt of your notice. Should Company fail to give such notice, or **if Company notifies you of Company's refusal to allow you to fulfill the applicable Recording Commitment**, your sole remedy shall be that you shall have the option to terminate the Recording Term by notice to Company within thirty (30) days after the expiration of the latter thirty (30) day period.

- 7 -

COMPLAINT

(emphasis added).

## 4.    The Requirements for Notices

26.    Section F.5 of the Recording Agreement, entitled "Notices," provides in relevant part:

> Except as otherwise specifically set forth herein, **all notices hereunder** shall be in writing and shall be given by courier or other personal delivery, by overnight delivery by an established overnight delivery service (e.g., Federal Express, Airborne Express, UPS, etc.), or by registered or certified mail (return receipt requested) at the appropriate address below . . . .

(emphasis added).

### C.    Jayde Makes Improper Demands Which Contravene the Terms of the Recording Agreement and Thereby Delay Her Timely Fulfillment of the Recording Commitment

27.    APG has long encouraged Jayde—and it continues to encourage Jayde—to promptly Deliver her First Album to APG.

28.    However, Artist has failed and refused to comply with the Recording Procedure set forth in Section A.4.a.  Artist has not reached an agreement with Company regarding the requisite elements in subsections (i)(A) through (i)(C) of Section A.4.a—let alone complied with the remaining requirements for the Recording Procedure.  This is due to Artist's recalcitrance, because Artist has rebuffed Company's repeated invitations to negotiate in good faith with Company regarding these matters.

29.    Artist has also improperly conditioned her Delivery of the First Album upon APG's acquiescence to unreasonable, unilateral demands that are contrary to the terms of the Recording Agreement.  By way of example, and without limitation, Artist has demanded that Company pay significant monies to a third-party individual as a purported "executive producer" fee, even though the Recording Agreement does not contemplate there being an "executive producer" for any Album, let alone that

- 8 -

COMPLAINT

APG pay fees to any so-called "executive producer."

**D.     Jade Baselessly Asserts the Recording Agreement Has Been Terminated**

30.     On August 30, 2024, counsel for Jayde served on APG a purported written notice under Section A.11.b.  First Am. Compl., ¶ 20.  (Hereafter, the "August 30, 2024, Purported Notice.")  The August 30, 2024, Purported Notice stated in relevant part: "Please accept this letter as formal notice that, pursuant to paragraph [A.11.b] of the Recording Agreement, Artist is 'ready, willing and able' to fulfill her remaining Recording Commitment for the Initial Period, specifically, by recording and Delivering her First Album to you."

31.     On September 5, 2024, APG sent Jayde a written response to the August 30, 2024, Purported Notice.  (Hereafter, the "September 5, 2024, Response.")  In relevant part, the September 5, 2024, Response stated: "Company disputes your assertion that we have refused to allow Artist to fulfill the Recording Commitment for the Initial Period . . . . Please feel free to contact us if you have any questions or would like to discuss this further.  We value our ongoing relationship and remain committed to ensuring that both parties fulfill their obligations under the [Recording] Agreement."

32.     Critically, APG never sent Jayde any notice stating that APG refused to allow Jayde to fulfill the Recording Commitment for the Initial Period.  To the contrary, APG informed Jayde that APG **did** allow her to fulfill the Recording Commitment and APG further stated its desire to reach an agreement with Jayde as to a mutually acceptable Recording Procedure pursuant to Section A.4 of the Recording Agreement.

33.     Nonetheless, on October 1, 2024, counsel for Jayde sent to APG a notice that purported to terminate the Recording Agreement under Section A.11.b thereof.  (Hereafter, the "Purported Termination Notice").  The Purported Termination Notice

- 9 -
COMPLAINT

was ineffective and did **not** cause the Recording Agreement to be terminated.

34.     Plaintiff had, and has, no right to terminate the Recording Agreement under the unambiguous terms of Section A.11.b of the Recording Agreement. Section A.11.b only provides Plaintiff with a termination right if **all three** of the following conditions are satisfied:

- **Condition One:** APG refuses without cause to allow Jayde to fulfill the Recording Commitment for any Contract Period;

- **Condition Two:** Within 90 days thereafter, Jayde sends APG a notice referencing Section A.11.b and advising Company that Jayde is ready, willing and able to fulfill the Recording Commitment; **and**

- **Condition Three:** Either (a) APG fails to send Jayde a notice within thirty days stating that she may fulfill the Recording Commitment; or (b) APG provides notice to Jayde of APG's refusal to allow Jayde to fulfill the applicable Recording Commitment.

35.     Here, Condition One was **not** fulfilled because APG did not refuse—let alone without cause—to allow Jayde to fulfill the Recording Commitment for the First Contract Period.

36.     Condition Three also was **not** fulfilled. *First*, as APG did send Jayde a notice within thirty days stating that she may fulfill the Recording Commitment, in the form of the September 5, 2024, Response. *Second*, APG never sent any notice to Jayde pursuant to one of the delivery methods required for a valid notice under the Recording Agreement—*i.e.*, by courier or other personal delivery, by an established overnight delivery service, or by registered or certified mail—stating that APG refused to allow Jayde to fulfill the applicable Recording Commitment. APG also never sent Jayde a notice by informal means (such as email) stating that APG refused to allow Jayde to fulfill the applicable Recording Commitment. Instead, APG encouraged Jayde—and continues to encourage Jayde—to fulfill the Recording

COMPLAINT

Commitment. Thus, the third necessary condition for termination under Section A.11.b of the Recording Agreement is not satisfied as a matter of law.

37. Accordingly, Jayde's wrongful contention that she purportedly terminated the Recording Agreement is utterly without merit.

**E.     Jayde Willfully Infringes the Copyrights in APG's Recordings**

38. The Recording Agreement clearly and unequivocally provides APG with the exclusive copyright in all recorded performances of Jayde that are created during the Recording Term. Section A.5.a of the Recording Agreement states in relevant part:

> All Recordings embodying the performances of Artist recorded during the Recording Term or submitted hereunder (excluding the underlying Compositions) from the inception of the recording thereof, and all reproductions derived therefrom, together with the performances embodied thereon, are and will be the property of Company throughout the Territory and in perpetuity, free from any claims whatsoever by . . . Artist or any other Person. Company has and will have the exclusive right throughout the Territory to copyright those Recordings in Company's name as the author and owner of them and to secure all renewals and extensions of copyright. Each of those Recordings shall be considered a "work made for hire" for Company . . . . If for any reason any of those Recordings is determined not to be a "work made for hire," then . . . Artist hereby irrevocably grant[s], transfer[s], convey[s] and assign[s] to Company the entirety of the rights, titles and interests throughout the Territory in and to each of those Recordings, including the copyright, all renewals and extensions of copyright, and the right to secure copyright registrations therefor . . . . Without limiting the foregoing, Company shall have the exclusive and unlimited rights throughout the Territory to own, control and use Artist's services as a recording artist during the Recording Term and to all the results and proceeds of such services.

39. Jayde has been uploading recordings of her musical performances that were created during the Recording Term to social media for streaming by the general public. These include the Covered Recordings that are set forth in **Exhibit A**.

40. Pursuant to Section A.5.a of the Recording Agreement, APG is the

- 11 -

COMPLAINT

exclusive copyright owner of the Covered Recordings.  APG has not authorized Jayde to upload the Covered Recordings to her social media—let alone for streaming by the general public.  Accordingly, by doing so, Jayde is infringing APG's copyrights in the covered recordings.

## CLAIMS FOR RELIEF

## COUNT I – Copyright Infringement

41.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 40 as if fully set forth herein.

42.   Jayde has engaged, and continues to engage, in the unauthorized reproduction, distribution, and public performance of the copyrighted works listed in **Exhibit A** for which Plaintiff is the exclusive copyright owner.  The foregoing activity constitutes direct infringement by Jayde in violation of 17 U.S.C. §§ 106 and 501 *et seq*.

43.   Jayde's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Plaintiff's rights.

44.   As a direct and proximate result of Jayde's infringement of Plaintiff's copyrights, Plaintiff is entitled to damages under the Copyright Act in an amount to be determined at trial.  Plaintiff is entitled to statutory damages for qualifying works, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages, including Defendant's direct and indirect profits from infringement, as will be proven at trial.

45.   Plaintiff is further entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

46.   Defendant's conduct is causing, and unless enjoined by this Court, will continue to cause, Plaintiff great and irreparable injury that cannot fully be

COMPLAINT

compensated for or measured in money, such that Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting further infringements of their exclusive rights under copyright.

**COUNT II – Breach of Contract**

47.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 46 as if fully set forth herein.

48.     Plaintiff has performed all requisite obligations under the Recording Agreement, or alternatively, is excused from same.

49.     Jayde breached the Recording Agreement by failing to Deliver her "First Album [to APG] within fifteen (15) months following commencement of the Initial Period," as required by Section A.3.b thereof.

50.     Jayde also breached the Recording Agreement by improperly repudiating her obligations thereunder without any basis to do so.

51.     Given that Defendant has repudiated the Recording Agreement, Plaintiff is excused from any alleged obligation, prior to commencing suit, to provide Jayde with notice and an opportunity to cure.

52.     Plaintiff has been damaged by the forgoing breaches in an amount to be determined at trial, but far in excess of the jurisdictional minimum of this Court.

53.     Plaintiff has no adequate remedy at law.  Accordingly, Plaintiff is entitled to injunctive relief, to prevent Jayde from furnishing her recording services to any third party.  Section F.7 of the Recording Agreement states in relevant part:

> You expressly acknowledge that Artist's services in the entertainment field are of a special, unique intellectual and extraordinary character which gives them peculiar value, and that in the event of a breach or threatened breach of any material term, condition, representation, warranty, agreement or covenant of this agreement, Company shall be caused immediate irreparable injury, including loss of goodwill and harm to reputation, which cannot be adequately compensated in monetary damages.  Accordingly, **in the event of any such breach, actual or threatened, Company shall have, in addition to any other legal remedies, the right to injunctive or other equitable relief.**

COMPLAINT

(emphasis added).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment from this Court against Defendants as follows:

    a.    For a declaration that Defendants willfully infringed musical recordings owned and/or controlled by Plaintiff in violation of the Copyright Act;

    b.    For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiff's rights under the Copyright Act; or, in the alternative, at Plaintiff's election, Plaintiff's actual damages pursuant to 17 U.S.C. § 504(b), including Defendants' profits from infringement, in an amount to be proven at trial; in all events, in an amount no less than $10 million;

    c.    For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiff's copyrights and/or other rights in the musical works, including a permanent injunction requiring that Defendants and their officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing or materially contributing to or participating in the infringement of any of Plaintiff's exclusive copyright rights, including without limitation in the musical works listed in **Exhibit A**;

    d.    For the disgorgement of all direct and indirect profits received by Defendants for the unlawful diversion of earnings from Plaintiff's

- 14 -

COMPLAINT

musical works for which Plaintiff has exclusive rights and has provided no license;

e. For an award of Plaintiff's costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

f. For an award of damages to compensate Plaintiff for Jayde's contractual breaches;

g. For an injunction to prevent Jayde from furnishing her recording services to any third party in contravention of the Recording Agreement;

h. For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Jayde; and

i. For such other relief and further relief as the Court deems proper.

DATED: December 18, 2024

*/s/ Jeffrey M. Movit*

JEFFREY M. MOVIT

- 15 -

COMPLAINT